Louise PLITT et al., Plaintiffs
Below, Appellants,

v.

Kenneth C. MADDEN et al., Defendants
Below, Appellees.

Supreme Court of Delaware.

Submitted Sept. 20, 1979.

Decided Feb. 6, 1980.

Eugene J. Maurer, Jr. (argued), and Arlen B. Mekler, Wilmington, for plaintiffs below, appellants.

Regina M. Small (argued), State Sol., Wilmington, for appellee State Bd. of Ed.

Colin M. Shalk (argued), of Tybout & Redfearn, Wilmington, for appellee Alexis I. Du Pont School Dist.

Before HERRMANN, C. J., DUFFY and HORSEY, JJ.

HORSEY, Justice:

The parent of a learning disabled child whom the parent removed from public school and placed in a private school seeks to recover three years of private school tuition costs from the local school district and the State Board of Education of Delaware. Plaintiffs assert as the basis for their monetary claim the denial of the child's constitutional rights (federal and state) to equal protection of the law and due process of law. More specifically, plaintiffs contend that the child was denied her right as a disadvantaged child to an equal educational opportunity; and further, that the administrative procedures of the local school district for determining the child's qualifications for special education as a learning disabled child were lacking in due process. The child's mother individually and on behalf of her minor child appeals Superior Court's grant of summary judgment to defendants, the Court finding no violation of plaintiffs' constitutional rights. We affirm in part, reverse in part and remand, for the reasons which follow.

I

The pertinent facts, viewed in a light most favorable to plaintiffs, the non-moving parties, are as follows. In June, 1974, plaintiff's[1] daughter Judith completed the sixth grade at the middle school of the Alexis I. Du Pont School District in New Castle County, Delaware. While Judith had been promoted each of the two previous years of her school attendance in the District and was designated for promotion to the seventh grade, plaintiff had been unhappy for some time with her daughter's academic progress. Plaintiff[2] did not feel that the school's program was effective or appropriate for her child's needs and she requested that the local school authorities make a professional evaluation of her daughter's educational status shortly after the close of the 1973–74 school year in June.

While plaintiff was pursuing this subject with the public school authorities, she enrolled her daughter in the 1974 summer school program at the Tatnall School, a private educational institution in New Cas-

---

1. The mother will be referred to as "plaintiff."

2. Plaintiff held a masters degree in special education and was employed by the Philadelphia school system as an Itinerate Learning Disabilities Specialist.

tle County, Delaware. She did so not with the intention of withdrawing her child (at least then) from the public school, but only because the public school had no summer program and out of her concern for Judith's school progress. Plaintiff was pleased with her daughter's progress at Tatnall's summer school and was surprised to find that her daughter's IQ score as determined at Tatnall was considerably higher than her public school IQ scores. This led plaintiff to pursue her efforts through the remainder of the summer to work out with the School authorities[3] a program for her daughter for the coming year that plaintiff felt was appropriate for Judith. Plaintiff informed the School authorities that it was her belief that her daughter's problems stemmed from a learning disability sometime before enrolling Judith in Tatnall in late August for the coming school year and removing her from public school.[4]

The School viewed Judith as an unexceptional child and an underachiever (i. e., her ability exceeded her performance) who should be promoted; while plaintiff took the position that Judith was an exceptional child who qualified for special assistance either in the "regular" school program or should be placed in a learning disability program.[5]

Plaintiff withdrew her daughter from public school and enrolled her in Tatnall because she believed the School would not come up with a program for Judith that met her special needs and in the belief that the School approved of her decision.[6]

Plaintiff states that several School officials conceded to her that they had no learning disability program within their middle school that was appropriate for Judith,[7] yet they would not approve her transfer to a nearby district's learning disability program that plaintiff believed was appropriate for her daughter; nor would they commit the teachers in their regular school program to give Judith special assistance.

The School Board, on September 17, 1974, refused to approve payment of plaintiff's Tatnall tuition costs. Presumably they relied in part upon the findings of the School's Disability Learning Committee which had concluded that plaintiff's daughter did not qualify as learning disabled. Plaintiff claims she had no knowledge of the meeting of the Committee nor notice of the meeting of the School Board and thus was unable to attend either meeting and present evidence in support of her position.

In late November, 1974, the Learning Disability Committee of the School met again to give further consideration to the question of the child's learning disability.

3. "School" refers to the Alexis I. Du Pont school that her daughter attended.

4. Defendants contend that plaintiff did not even suggest to School personnel that her daughter had a learning disability problem or request a learning disability program until the fall of 1974 and after her daughter had been removed from School and enrolled in Tatnall.

5. The term "learning disability" is a word of art that was defined under 14 Del. C. § 3101(6) [since repealed and replaced by 61 Del. Laws, C. 190] to mean:

"a disorder in 1 or more of the basic psychological or physiological processes involved in understanding and in using spoken or written languages. These may be manifested in disorders of listening, thinking, talking, reading, writing, spelling or arithmetic. They include, but are not limited to, conditions which have been referred to as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia and/or developmental aphasia. They do not include learning problems which are

due primarily to visual, hearing or orthopedic handicaps, to emotional disturbance if these are provided for elsewhere or to mental retardation or to environmental disadvantage."

6. According to plaintiff, several School officials also told plaintiff that they would support her actions in enrolling Judith in Tatnall by requesting their State Board to pay Judith's tuition at Tatnall and that the Board always followed their recommendations. However, according to the State, Tatnall School did not provide a program for children with learning disabilities; and did not request nor was it approved for private placements by the State Board of Education. And the State contends that plaintiff knew this since at least the beginning of Judith's first year at Tatnall.

7. The middle school's learning disability program was stated to be limited to slow learners with behavioral problems—which Judith was not.

The Committee by then had received reports from a psychologist retained by plaintiff as well as the school psychologist.[8] While both reports stated that Judith had a learning disability problem, a majority of the Committee again concluded that the child was not learning disabled. Despite this finding, the School submitted a special learning program to plaintiff which she rejected.

Plaintiff appealed the Committee's decision to the local School Board which affirmed the Committee's decision. Plaintiff then appealed to the State Board of Education which in January, 1975, ruled that plaintiff's child was learning disabled within the meaning of 14 *Del. C.* § 3101(6). The State Board concluded that the most appropriate educational placement for the child would be in a public school setting with supplementary assistance provided by a learning disability teacher or reading specialist.

In March, 1975, plaintiffs filed suit in the Court of Chancery; but the action was dismissed for lack of jurisdiction in July, 1976. Thereafter, the complaint which is the subject of this appeal was filed in the Superior Court.

Plaintiff did not re-enroll her child in the Alexis I. du Pont School District following the decision of the State Board of Education and the child remained at Tatnall for the balance of the 1974–75 school year.

In June, 1975, the School prepared and presented to plaintiff an educational program for Judith for the School's 1975–76 academic year that was based upon the learning disability program recommended in January by the State Board of Education. However, plaintiff rejected the School's disability program proposal; as she did a revised proposal that was shortly thereafter submitted to her. Instead, plaintiff's daughter remained at Tatnall for the 1975–76 school year as well as the following year. Plaintiff has never re-enrolled her

daughter in the Alexis I. du Pont School District.

## II

Plaintiffs claim that defendants denied them equal protection of the law in failing to provide Judith, as a learning disabled child, with an appropriate and "meaningful" education. While conceding that the State Board of Education and the Alexis I. du Pont School District provided an educational program for learning disabled students and that Judith was not denied admission to the public schools of the District because she was learning disabled, plaintiffs contend that the mere availability of such a program was insufficient and defendants were required to do more. Plaintiffs maintain that equal protection required the School to provide Judith with a learning disability program that was tailored or specially designed for her needs. This, plaintiffs claim, defendants failed to do, not only before but after the State Board ruled that Judith was learning disabled.

Defendants' response is that no equal protection issue exists, *first*, because of Delaware's statutory plan and program for the education of learning disabled children and *second*, because Judith was never denied admission as a learning disabled child to the Alexis I. du Pont School District after that determination was made in February 1975. We agree with defendants' construction of the extent of the equal protection requirement as to education.

Under federal law, equal protection within the field of education requires the provision of equal educational opportunity to all children with the State, not only the able but the disabled or disadvantaged. *Cuyahoga Cty. Ass'n for Retarded Children, etc., v. Essex*, N.D. Ohio, 411 F.Supp. 46 (1976). Under *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), federal concepts of equal protection in the field of education

8. The record indicates that plaintiff's expert's report on Judith was dated in late October, and two other reports in November; and defend-

ants imply that not until then was the School on notice that Judith had a learning disability problem.

override state provisions that may be less broad.[9]

Since 1969 and the enactment of 57 *Del. Laws*, c. 237, Delaware has provided special education for children determined to have a "learning disability" disorder, as defined in 14 *Del. C.* § 3101(6), supra. Pursuant to 14 *Del. C.* § 1703(f),[10] there existed within the Alexis I. du Pont School District a learning disability committee whose purpose was to evaluate potential candidates for enrollment and to recommend appropriate placement of such candidates, either with the District or a nearby district and if such facilities were not available, only then in a private school. Section 1703(f) was implemented by rules and regulations of the State Board of Education, which included provisions for private placement, at partial public expense [11] only if (1) the public school of the learning disabled student determined that the student could not be adequately and appropriately educated in a learning disability program within its public schools or those of a nearby district; and (2) the private school had an approved learning disability program appropriate for the student.

The Court below denied plaintiffs' equal protection claim, stating,

"Judith was not denied admission to the public schools because she was learning disabled. Delaware public schools have programs for the learning disabled as well as tuition reimbursement where adequate instruction is unavailable in the public schools. Judith's withdrawal from the public school system was the result of her mother's dissatisfaction with the handling of Judith's learning difficulty.

"The issue, then, is not a denial of education to a learning disabled child, but rather whether there was a failure to recognize the existence of a learning disability. This is a due process question. . . ."

We would add that merely because an education program may be imperfect does not render it constitutionally invalid. As stated in *Cuyahoga*, "the problems of government are practical ones and may jus-

---

**9.** Article X, Section 1 of the Delaware Constitution states:

"The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools, and may require by law that every child, not physically or mentally disabled, shall attend the public school, unless educated by other means."

**10.** 14 *Del. C.* § 1703(f) [since repealed and replaced by 61 *Del. Laws*, C. 190] provided: "The State Board of Education shall provide through rules and regulations for the establishment of evaluation and placement committees in the school districts of the State, the purpose of which shall be to evaluate each potential candidate for enrollment in a class in the category known as 'learning disabilities' and to recommend appropriate placement to the parents or legal guardian of the potential candidate and to the superintendent of the school district. Each evaluation and placement committee shall contain a psychologist, psychiatrist, or both licensed to practice in this State. No school district shall be entitled to enroll more than 2% of its enrollment in this category described as 'learning disability.' No state expenditure for classes in the category known as 'learning disability' shall be authorized unless the qualifications of the teacher and the instructional program shall have been approved by the State Board of Education. In any instance in which such an evaluation and place-

ment committee certifies that a particular child cannot be adequately served in any of the units described in this section for handicapped children, including the unit described by the term 'learning disabilities' or where such a unit for learning disabilities is not available in the district of residence or a district within reasonable transportation distance of the home of the child, then the committee may recommend to the parents or legal guardian of the child and to the superintendent of the district that the child be authorized to attend a specialized public or private school in this State or in another state of the United States and that the district of residence be authorized to include in the budget of that district a separate amount to be drawn from state funds, which may be used to cover the cost of tuition, transportation and housing for such specialized assignment. Such amounts may be used up to but not in excess of an amount equal to this State's average expenditure per pupil as expended from state funds in the prior year. . . . "

**11.** See § 1703(f), *supra*, for the limitation then in effect, which was substantially less than Tatnall's tuition. The maximum tuition reimbursement available to an individual for an approved private school placement, as calculated by the State, would be: $1,052 (1974); $1,126 (1975); and $1,242 (1976).

tify, if they do not require, rough accommodations . . . ." (411 F.Supp. at 56). Had the State of Delaware lacked a learning disability program or the School District failed to provide such a program, or for alternative disability learning as provided under § 1703(f), a claim for denial of equal protection of the law might lie. But that is not this case; and we agree that no equal protection claim lies.

## III

Plaintiffs do not claim that the statutory procedures of § 1703(f) or the rules or regulations of the State Board applicable to the local School District are lacking in due process. The gist of plaintiffs' due process claim is that the local officials did not act promptly enough and then when they did act in early September they did so without notice or knowledge of plaintiff and without giving her an opportunity to be heard. Further, the officials took inconsistent actions as to her daughter's qualification for tuition reimbursement at Tatnall, thereby misleading plaintiff into believing that the School would reimburse her for her Tatnall tuition costs or some portion thereof.

■ Plaintiffs' claim of denial of due process by the action taken by the local School authorities after the State Board's determination that her daughter was suffering from a learning disability is more difficult to understand. Plaintiff states that the local authorities were "unable, if not unwilling, to develop any program tailored to [her daughter's] individual needs and appropriate to her disability" and contends that the District's disability programs were simply inadequate for her daughter. However, the evidence is clear and undisputed that plaintiff rejected out of hand during the summer of 1975 a program which the School prepared for her daughter for the next academic year and which incorporated the recommendations of the State Board as to learning disability assistance for her daughter. Thereby plaintiff prevented any implementation of the learning disability program proposed by the State. Since such a program is necessarily cen-

tered in the public school system, it was necessary for plaintiff to permit the program to be carried out within a public school setting. Only if such program proved inadequate was recourse permitted under 14 *Del. C.* § 1703(f) to a private school. Plaintiff may elect private over public education but to participate in the learning disability program provided by the State at its expense, plaintiff must abide by the provisions of the statute governing such program and and the regulations adopted thereunder. Hence, plaintiff's claim as to her private school tuition costs for the academic year 1975–76 and the subsequent year was properly denied by the Court below.

■ Nevertheless, we believe a different result is required as to plaintiffs' claim for reimbursement of 1974–75 school tuition costs. The Trial Court correctly stated the question to be whether plaintiffs were denied due process in the proceedings of the school authorities to determine whether the child was learning disabled. And the Court recognized that this required examining the State's procedures for evaluating learning disability and determining "whether there was a failure to recognize the existence of a learning disability."

However, the Court then decided there was no failure of due process by reason of the action finally taken by the school authorities in late fall of 1974 that ultimately led (by virtue of plaintiffs' appeal to the State Board) to the child being found to be learning disabled. In so ruling, the Court failed (1) to give any apparent consideration to the timeliness, or lack thereof, of the action taken by the local school authorities to provide an appropriate educational program for the child for the 1974–75 school year; and (2) to consider whether plaintiffs' claim for recovery of 1974–75 private school tuition costs stood on a different footing from plaintiffs' claim for reimbursement of subsequent years tuition costs.

Instead of determining whether the local school district's procedures prior to November 1974 met the requirements of procedural due process as to the child's educational

opportunity rights for the 1974–75 school year, the Court viewed plaintiffs' due process claim as entirely controlled by the November proceedings of the local school authorities and the ultimate and favorable decision of the State Board of Education that the child was in fact learning disabled. The Court thereby impliedly found that the November proceedings of the local school authorities cured any lack of due process resulting from earlier action or inaction of the local school authorities. Under the Court's reasoning it was immaterial to plaintiffs' educational opportunity due process rights when appropriately conducted administrative disability evaluation hearings were held; and plaintiffs were required to await the ultimate decision of the State Board (whenever that might be) to qualify for learning disability benefits. By plaintiffs' failure to await such ultimate determination by the State Board, the Court held that plaintiff failed to pursue her available administrative remedy and by her unilateral action to remove her daughter from public school and enroll her in private school, she was precluded from any tuition reimbursement.

We cannot agree with the Court below that the action taken by the local authorities from November 1974 forward was sufficient to satisfy plaintiffs' educational opportunity due process rights for the 1974–75 school year. The Court below found that in June 1974 plaintiff had requested a professional evaluation of her daughter's education status for the coming year. Yet the local Learning Disability Committee was not convened to consider the child's qualification for learning disability assistance for the 1974–75 school year until September 12, and then did so at a meeting as to which plaintiff had no notice or opportunity to be heard; and such rights were not accorded plaintiff until November, 1974 with the result that plaintiff's child was not ultimately determined to be learning disabled until January, 1975 by which time the school year was half over.

While we appreciate the difficulty involved in determination of the existence of a learning disability, we must conclude that the local District failed to accord plaintiffs due process in both the procedures employed and the lateness of invoking such procedures so as to effectively deprive plaintiff's child of her right as to educational opportunities as a learning disabled child for the school year 1974–75.

■ Hence, we hold that the Court erred in granting, summary judgment for defendants as to plaintiffs' claim for recovery (within statutory limits) of their private school tuition costs for the 1974–75 school year because the local school district's procedures for determining plaintiff's child's qualification for learning disability educational assistance for the 1974–75 school year were lacking in due process. However, plaintiffs' right to such recovery cannot be determined on the present record without remanding to the Court trial because (a) plaintiffs did not move for summary judgment; and (b) of the existence of disputed questions of fact relating to such claim. One apparently disputed factual issue concerns plaintiff's knowledge (or lack thereof) at the time of enrolling her daughter at Tatnall School for the 1974–75 school year that Tatnall was not approved for private placement for learning disabled children, and a related question of whether plaintiff was misled to believe that her Tatnall tuition was recoverable.

Therefore, we reverse and remand to the Superior Court for further proceedings consistent herewith as to plaintiffs' claim for tuition reimbursement for the 1974–75 school year; and in all other respects we affirm the judgment below.

AFFIRMED in part, REVERSED in part, and REMANDED.